25-11270, StarPro, Greens, Incorporated, et al. v. Polyloom Corporation of America. Whenever you're ready. Good morning, Your Honors. This is Jury Boss for the appellant, StarPro, Greens. We're here today on a simple 12B6 motion to dismiss by the district court. In its court's order, you dismissed every count I presented. We're only on appeal on four. Counts one and two, which involved antitrust claims, breach of contract claim, and a partnership claim. So the court asked that all arguments be presented. I'm sure there are questions that you all have. I actually stand by the briefs as pled, but I'll continue presenting some oral arguments here. All right, let's talk about the antitrust claim. I anticipated that, Your Honor. So tell me what you, first tell me what you think the relevant geographic market is, and tell me what you pled as to the geographic market. Yes, Your Honor. In the relationship which my client had with the defendant, it's the United States of America. It's the only market that my client has ever sold product to. It is the market in the area which, even with the association with the defendant, the only product has ever been sold. We pled that in the complaint based on real world conditions, not on theoretical things. It's the United States of America. The reason for that, Your Honor, the product that we're discussing about, and I believe a little bit needs to be explained on that. We're talking about a putting mat that's 15 feet by 28 feet, so 400 square feet. It's huge. The purpose of this putting mat is it allows a person to put in different directions and obtain the same stamp value. That's what makes this product unique. That's why the defendant came to us. That was the market that we had defined. It's the market, the product market, which the court accepted at the district court. So these are big, heavy items. They weigh, I may have can be between $400 to $1,000. The product itself costs $3,000. So a third of the cost is just shipping. It's not practical to go otherwhere, any places. That's why my client has only done the United States of America. And actually, the cost of shipping is pretty detrimental on some of her sales because it goes across country. But then the complaint alleges at one point that there are a number of firms in Georgia that could come up with this product. So where's the monopoly power if the market is the United States? The monopoly power, actually, is straight up in the refusal to deal scenario. Straight up. No, no, no. But you can't bootstrap monopoly power with a claim of refusal to deal. Refusal to deal requires that there be monopoly power or something very close to it, right? It's inherent because if the relationship exists, such that the entity involved by manufacturing this is the sole entity that manufactures it, I'm reliant on them. And we entered into a voluntary relationship. But there's nothing that- Go ahead, sir. There's nothing that would necessarily require it to be the sole entity, right? Excuse me, I don't understand the question. There's nothing that would necessarily require the manufacturer to be the sole manufacturer, right? I believe you admitted that it will be possible, even if your client wanted to, that he could manufacture this. Again, candidly, hypothetically, I can create Google. Hypothetically, it doesn't exist. No, no, no. Hypothetically, you could create another search engine. I guess you're correct. You're correct. But in practicality, it doesn't exist. And the facts actually show in real life, this case was filed almost four years ago. Practically, it doesn't exist. No, no, it could. Four years ago is when all this started. If it was so readily available, my client would be in business. He's not. And why isn't he? Because it's not available. It's as simple as that. There's nothing in the complaint about how profitable this market was, what the barriers to entry are or were not, why those companies that could make the product didn't make the product. An antitrust complaint is a difficult animal to draft. People forget that Twombly was an antitrust case. Yes, sir. And you need allegations that make your refusal to deal claim plausible. And if you had a product, let me tell you where my possible concern is. Sure thing. If you had a product that could be manufactured anywhere by anybody, almost anybody in the United States, but the profit margin was only two cents on the dollar, and the other companies that could make the product chose not to make the product because of the small profit margins, and only three companies made the product in the whole of the United States with limited customers, do you have an antitrust claim if they refuse to sell to you? I have an antitrust claim under Aspen in refusal to deal because they do have a monopoly, they are the only ones that made it. They didn't make it until they even brought me on board. My clients are, not me. And they do make it. They do have the monopoly because I do not have availability. And what had happened in the antitrust scheme is their actions were to remove me as a competitor and to consumers, they jacked up the price three times. This is what antitrust is about. You're not a competitor. You're not making the product. I was a competitor prior to them bringing me on board because I have a market. I have a market that they didn't have access to. So they brought me in. They now have access to that market. They used my, I've been in this market, my client's been in the market for like 10 years. And to answer the question, what happened? As a distributor, not a manufacturer. In the market, previous market, there was a client who manufactured this product for me. This is not a distributor relationship. It just isn't. They called me in to use my goodwill and they teamed up. They did the cutting. They did the shipping. They did the manufacturing, okay? I, as the arm, was the marketing arm. There's no distribution. It's not, it wasn't theirs. They made it for me. Fair enough. But nonetheless, in a refusal to deal situation, like Aspen, there's a voluntarily engaged. Let's talk about Aspen a little bit more because I know you rely on that case. But in Aspen, it was a little bit different, right? Because there, there had been, there were constraints in terms of the market, right? It wasn't that somebody could go out and make another mountain. There are the only, only the four mountains. And then one company controlled three of them and then excluded the other one. I have a hard time seeing how that's comparable to what you have here. Because again, another manufacturer could go out and make the same putting surface. So how are you on, how are you factually analogous to Aspen? I'm actually changing a little bit as a refusal to deal scenario. That when there's a voluntary relationship, when somebody has a monopoly, and then they terminate me, they terminate. Why do they terminate me? To put me out of business so then they can jack up the consumers. They did it to eliminate competitor. That's not even Aspen. They, they didn't do the joint ticket, which caused damage to the defendant. But it didn't put him out of business. This was total exclusion. This was an attempt to exclude my plaintiff from the marketplace so they could jack up the price and the consumers are damaged. Straight up. So the hypothetical, as pled in the complaint, we alleged a product market. District Court didn't challenge the product market. He said we don't have monopoly power. But under Aspen, basically the state's, correctly in the state, if a firm has been attempting to exclude rivals, it's fair to characterize the behavior as predatory. That's exactly what we have here. They did predatory things. What does the market consist of in terms of sales? You said the market is geographically the United States, right? Correct. What does the market consist of? How many consumers? How many sales? What's the gross amount? Well, it's my, it's my client's livelihood. No, that's not answering the question, Mr. Boss. Okay, I, I, I don't. If the market is the United States, yes, you need to have some idea of what that market consists of. So how many sales of the product occur in the United States within a given year before this exclusionary conduct occurred? Okay, so we're talking about the product market. The product is the MPT putting turf itself. And the geographic market in the United States. When they, when my client first met with the defendant, they, they thought it was a $2 million market. How many sales? I think the product, the high product is $3,000. So what if that defied, I don't know, top of my head, sir. Okay. At the pleading and the complaint, you know. Is that in the complaint? No, I'm not. But is my complaint plausible? Because my client is plausible. Don't you think you need that for market and monopoly purposes on an antitrust claim? In a refusal to deal? Yes. The product that exists that is being refused to deal with is the question. And the impact of it. But you say in your brief, you admit in your brief, that even Aspen requires the existence of monopoly power. And we're trying to figure out what it is in the complaint that establishes that the defendants have monopoly power in this market when other people are capable of entering the market without barriers. Honor, first of all, I'm out of the time that I've set. No, no, please go right ahead. You're on our time. Okay, I appreciate it. And I apologize. I was looking at the clock. That's okay. Could you please repeat what you asked, Your Honor? Sure. Thank you. We're trying to figure out. Okay, let me step back. I think you concede in your brief that even under Aspen, for a refusal to deal, you have to establish monopoly power on the part of the defendant. Is that right? Candidly, Your Honor, I do not call if I admit that or not. Candidly. Okay, forget whether you admitted it or conceded it or not. But I do. Do you need to show monopoly power in a refusal to deal scenario under Aspen? The monopoly power exists because of the exclusionary practices which they undertake. No, that's not necessarily true, Mr. Boss. If you have 10,000 distributors of this very product who make it, there are 10,000 of them scattered throughout the United States, and one of them declines to sell to you or to your client, that's not exclusionary under antitrust law, right? Sir, on a refusal to deal, that's exactly what it is. On refusal to deal, if I have a voluntarily engagement on an individual that has, and they develop this, do they have monopoly power? Because of the arrangement. If my client could buy this from somebody else, he gladly would. It's not available. No, you have to accept my hypothetical. Your hypothetical, if 10,000 people manufacture it, yeah, then I don't have antitrust claims. No, of course not. And that's because they don't have monopoly, neither one of those 10, none of those 10,000 have monopoly power. I agree with you, Your Honor. Okay, so do you think you need to show monopoly power in a refusal to deal scenario under Aspen? I will have to prove it, yes. Do you have to allege it? I believe I efficiently have alleged it. Okay. All right. You have your full time left for rebuttal, Mr. Boss. Thank you. Thank you, Your Honor. How do I pronounce your last name?  Deleve, okay. Mr. Deleve. Yes, may it please the Court. My name is Devin Deleve, counsel for the Appalese, Polyloom, and Challenger Turf. And just to begin, I think, with the last question. And this is what is one of the big issues that's lacking in the pleading of the first amended complaint, which again was fixed from when they tried to plead it the first time, is there really is no pleading of monopoly power. Yes, the amended complaint uses the term monopoly, but they don't actually plead monopoly power, which is basically the power to raise prices and exclude competition. If you look at what actually happened here, and what is alleged in the complaint is StarPro had this product. They call it Master Putting Turf. It went along with a golf ball receiver that they were sold as a package item. But this Master Putting Turf, they say, is this special, unique product. They had been making it and selling it for years, StarPro had, with an unnamed company. It was actually identified at the hearing in district court, but there was an unnamed company, another manufacturer, not Challenger Turf, who made this product for many, many years. And then in 2020, that company stopped making it. So that's then leave StarPro, which we say is a distributor, looking for another manufacturer. They come to my client, Challenger Turf, which is one of many, you know, Dalton with the carpet industry and the like, also artificial turf, one of many manufacturers in that area that can make an artificial turf. At that point, when StarPro's relationship with the unnamed company, which as far as we know, is still in the market, could still make this product if they wanted to. In any event, StarPro came to Challenger Turf, arranged for Challenger Turf to make this product. Interestingly, it's actually pleaded in the complaint, and my colleague Mr. Boss here on the other side did not address it, but what is pleaded in the complaint to explain partially what happened, but I would say this is why so much of this complaint is trying to fit a square peg in a round hole. And this just doesn't fit antitrust as the hole they're trying to fit it in, and it's not fitting the square peg, is you have a gentleman named David Calhoun. He worked for the unnamed company, knew Mr. Selton, the owner of StarPro, knew StarPro, worked for them for years. When Mr. Calhoun left the unnamed company, the unnamed company stopped making the product. You know, there's a lot we could hypothesize. I don't think it's necessarily to speculate on a motion to dismiss as to what happened, but maybe it wasn't the most profitable product. Whatever else, the unnamed company stopped making it. Then you have David Calhoun joins Challenger Turf. He connects with his old friend, buddy, Mr. Selton. Challenger Turf starts making the product. Um, they have one year, one season. And actually, I think the way they pleaded, they said the season goes from the spring till about September. And the way it's pleaded in the complaint, they actually didn't have any product available till August 2021. So basically, they sold the product for a month or two. And that is StarPro was selling the product, Challenger Turf was manufacturing it. Next year, jump ahead to 2022, and this is paragraph 88 of the complaint, David Calhoun leaves. He actually goes to yet another turf manufacturer. It's pleaded in paragraph 88 of the complaint that David Calhoun actually approached Mr. Selton again and say, you want to come to the third company. For whatever reason, StarPro decided to say, well, no, we're going to stick with Challenger Turf. This was the whole 2023 claim that goes to the state law, not necessarily antitrust, but the state law claim on non-conforming goods and whether there was a breach of warranty. But the point is, it is actually in there in the complaint as to what happened that basically it seems, and why we think there is no monopoly power is that other manufacturers could make the product. And in fact, the unnamed company was making the product. So why this is not an anti- Before the plaintiffs went to your client. Correct, correct. No allegation in the complaint that they're still making it, right? No, there's no allegation that they're still making it. But what that would suggest is what is alleged here is we have StarPro as a distributor for Challenger Turf as a manufacturer. And for whatever reason, of course, we're on a motion to dismiss, so it's not developed in the record. But for whatever reason, Challenger Turf and its related company, Polyloom, decided they didn't want to deal with StarPro anymore. But that's their right. Under antitrust law, unilateral refusals to deal are not an antitrust violation. So they decide they do not want to deal with StarPro anymore. The allegation is the complaint is Master Putting Turf is still being sold under another name by Challenger Turf and Polyloom under this In The Lawn line of products. But it's not specified. Are they using other distributors? How are they selling it as a dual distribution? None of that is clear. What is clear is they say the product is still out there. They also allege that the price has gone up, but they don't explain why. And that's why we say there is no monopoly power. Assuming Challenger Turf is still manufacturing, is still selling the product, just not through StarPro, there's still no monopoly alleged because at what point can StarPro, you know, raise the price to monopolistic pricing before the unnamed company enters, Mr. Calhoun's new company enters? You know, at this point, none of that is alleged that there's any way that there is a monopoly power. It would seem that other companies can manufacture it. So if monopoly prices were charged, other competitors would enter the field. But you don't need prices to have gone up in a monopolistic fashion to have a monopoly. You can have a benevolent monopolist for a period of time until the time is right to strike. Well, and that's exactly right. If you go to the elements of a claim for monopolization, elements are one, monopoly power, and two, the willful acquisition of it. So if you just happen to have a monopoly but haven't done anything improper or untoward to maintain that monopoly in the second element, there's no Section 2 claim. And in fact, when you go to the attempted monopolization, there's now a third element of specific intent. And none of that is plausibly pleaded in the complaint. Talk about the market and your perception of what the complaint alleged as the geographic market and why the district court correctly assessed the allegations. Yes. So if you look at paragraph 122 of the complaint and you heard what Mr. Boss said earlier, is he saying the market is the continental United States? It's actually unclear whether that would include Alaska or not, if it's continental, lower 48, whatever else. It's the United States, not including Hawaii, presumably. But paragraph 122 says other geographic markets are possible. So basically there is no analysis on the complaint in the market, and that's exactly what is required to plead an antitrust case. That he's saying, he's selling, so what do do-it-yourself installers of putting turfs purchase in Canada? Complaint says, according to the complaint, we don't know, but there are two elements of the market. One is where you're selling to, and Mr. Boss pleaded that StarProbe was only selling to the United States. And the second issue is, of course, in geographic market, is where can supply come from? And actually that is pleaded in great detail in the complaint because they like to point out a Challenger turf, Parley loom are part of this great large conglomerate of Tenkate that's importing products into the Port of Savannah and is a worldwide artificial turf distributor, which again begs the whole question of how do you draw the market? You know, if Challenger turf were to charge monopolistic pricing, where would the competition come from? Could come from another artificial turf manufacturer in and around Dalton, Georgia. Or it could come from a Canadian manufacturer, a Mexican manufacturer. None of that is pleaded. What you heard from Mr. Boss is that the market of the United States, because it's a bulky product to ship, which then, of course, begs the question about the allegations of complaint that Polyloom is taking shipments of turf in Savannah. But regardless, it may not be turf. Maybe it's the components for turf. So I don't want to read too much into that in the complaint. But the point is, if it's the shipment cost, what's the difference in shipment cost from shipping something to Windsor, Ontario versus Detroit, Michigan? That if shipment cost is the limit, you would think at least parts of Canada and Mexico would be included and it would probably be cheaper to ship to Windsor, Ontario than it is to Seattle, Washington. So again, none of that is pleaded in the complaint. On product elasticity. Right. How much needs to be pleaded in a complaint? More than pleaded here, which I know is the obvious answer. But specifically, there is no allegation if this master putting turf is this unique product. And that's what, of course, everyone in an antitrust claim, if you're the plaintiff, wants to say. My product is unique. Therefore, my product is the market. And from the perspective of someone like Challenger Turf that makes all sorts of artificial turf, a whole bunch of various putting turfs, I mean, one thing, he has the do-it-yourself market. What is the putting turf market for professional golf shops that like? That would be probably a different market than the do-it-yourself market. But again, at what prices do consumers look for different products? And the argument that Mr. Boss would make is that the consumers never look for different products. Well, every seller of a product would like to say that. It's rarely true. I draw attention, actually. It's the 1993 11th Circuit opinion of U.S. Anchor where they actually backed it up with data. And I know there's a record. But there, they actually backed up with data that so-called Danforth anchors had such brand loyalty that consumers didn't switch and buy a generic anchor even if the Danforth anchor price doubled, tripled, whatever it would be. The consumers were not price sensitive. None of that has been pleaded here. What is pleaded is that consumers choose to pay more for this master putting turf than for regular run-of-the-mill, so to speak. And I know that's kind of awkward when you're dealing with a mill producing it. But yes, run-of-the-mill putting turf that consumers will pay more for it. But how much more? And that's the sort of thing, just like if you go to the Jacobs v. Tempur-Pedic case, just saying that viscoelastic mattresses cost more than spring mattresses really don't establish that viscoelastic mattresses are a separate market from a mattress. A mattress is the end of the day of something you sleep in. Are there different customers? Are there different there? What other products, and it's not pleaded, would a DIY customer look at? One thing he say, for example, is that what makes this product unique is that it's somehow omnidirectional. It doesn't matter which side you put from. Well, maybe at a certain price point someone will say, okay, I always put from this direction on the product and not from that. None of that is pleaded and explained about any sort of consumer price sensitivity. And again, I think this is one of the problems that you have in antitrust cases. From the perspective of a seller, if StarPro has only ever been selling master putting turf, one specific product, this cross-stitched mat with a rubberized mat on the bottom and cross-stitched fibers, they're looking and saying our product is unique. From the perspective of Challenger Turf that's making all sorts of putting turfs of various descriptions, quality, sizes, the like, it's all part of a continuum. And consumers will go from one product to another based on price and other factors that haven't been explained in the complaint. So, would it have been sufficient, at least for purposes of product market, for the plaintiff to have alleged as the price of master putting turf goes up, consumers don't buy other turf products? Actually, according to U.S. Anchor, I think that would have potentially been sufficient, yes. But hasn't the complaint essentially said that in other words? Not in those words because... That's what I said, in other words. But isn't that the gist of the allegations? They say that consumers will pay more for it, but how much more? There's always a point, right? Does there have to be some empirical information in the complaint about that, that would support a general allegation that as the price of master putting turf goes up, consumers don't buy other turf products? Yeah, I think it has to be pleaded plausibly. Just saying it in conclusory fashion, and I think that's the way to say it. Right now, the complaint says in conclusory fashions that customers are willing to pay more for the product. I think the complaint needs to say more than that. I want to ask you one question on the partnership claim before you sit down. Okay. Did the district court err when it imported the UCC's requirement of a written contract into this Georgia partnership claim? I don't think so, but I will acknowledge if you go to the 1954 Baker v. Schneider decision that looked at oral partnerships and what's able to create it. In 1954, they didn't analyze the UCC. Well, let's suppose the plaintiff is right about that argument, that there's no requirement of a written contract. How would we affirm the dismissal of that claim? Well, again, you can affirm on any basis in the record below. And here, there isn't any evidence of an agreement. I mean, the oral partnership, any partnership under Georgia law is basically an agreement to share the profits of a business. And this is one of the problems of the antitrust claims. It's why Aspen's scheme doesn't apply is you really have participants on different levels. You've got a manufacturer and a distributor. And just as that's a problem for the antitrust claims, it's a problem for the oral partnership claims because if you read the allegation of complaint, the only time the profits are, quote, shared is when StarPro issues a purchase order. And that's a typical manufacturer. Why is that a problem? Pardon? You only share profits when profits are made. What's the problem with that? In other words, only when a sale is generated will there be profits. And at that stage, the participants share in the profits. What's problematic about that? Well, the problem with that is that every distributor-manufacturer relationship involves the issuance of a purchase order to obtain the goods, which is then fulfilled and then invoiced. And by that definition, every relationship between a distributor and a manufacturer would meet that definition. That's not necessarily true. You could have a company like Mr. Boss's client pay your client a fixed amount for producing the product. And then if he's a distributor, then he sells the product on to his customer for whatever price he believes is appropriate and the market will bear. And he reaps the profits of that sale. You reap the profit, your client reaps the profits of whatever the profit margin is between what it costs to sell it and what it costs to make it. I mean, that's not a sharing of profits. That's what I'm saying. That description is not a sharing of profits, nor is how he was- The complaint says that there's a sharing of profits. A sharing of profits by issuance of a purchase order. It doesn't matter how it's done. Sharing of profits means that there's a pot of money that exceeds the cost of production. And then from that excess pot, the participants are going to divvy up the excess amount. That's a division of profits. The scenario I laid out is not a profit sharing scenario at all. You recoup your cost of production when you sell to Mr. Boss's client and you put a profit margin in there. So if it costs you $2,000 to make the product, you sell it to him at $2,700, you make $700. And then he decides, okay, I'm paying $3,000. I'm going to sell it for $34,000. He makes $400 out of the thing. You guys aren't sharing profits. You're each making profits out of your own decisions in the distribution chain. But the district court understood the complaint to allege a sharing in profit. That's on page four of its order. So what did the district court get wrong? I can actually pull out because I actually had made notes of every allegation in the complaint, the numbered paragraphs, where they referred to the issue of the purchase order. And I think where the district court had the confusion perhaps on the sharing of profits is because it's pleaded in conclusory fashion that there was a sharing of profits. And maybe, well, I would say that's probably too conclusory for purposes of Twombly, but the court doesn't even need to go there because then it pleads purchase orders were issued. And one thing I would note, and I know I'm over time, and I also know that changing the hypothetical can be a problem, but would you bear with me or may I? If you can do it in 45 seconds, yes. Oh, yeah. All I was going to say is that why we think this is a typical distributor-manufacturer relationship is one of the things that's pleaded is StarPro would say, okay, this is what our anticipated needs are this season, and Challenger Turf would go ahead and run it before StarPro had made a sale and issued the final purchase order. If this were like some sort of partnership, then there could be a claim on the other side if StarPro actually never went out and sold the product, but that's not what this is. This is a manufacturer making product and selling as it sees fit, and if StarPro issues a purchase order for the product and they can fill it, they fill it. All right. Okay. Thank you very much. Thank you, judges. I'll go quick, so I'm going to talk fast. A lot on the table. That's okay. You don't have to talk that fast. I got five minutes. Better for us to understand you. We're going to talk about the partnership real quick. It's my error in the complaint. I called it a purchase order. It's not a purchase. It is a purchase order, but it's not. What happens in this relationship, we were the selling unit. Again, we worked with them. What are we going to make? I'm going to sell it. You make it. You store it. You inventory it. I get an order. I tell you to that through this document, which I call a purchase order, who the client is, customer, what he wants. You cut it. You roll it up. Defendant cuts it, ships it, sends it out. I get paid. I pay you. That's the sharing the profits. Nobody made money until a customer out there paid me. I paid them. What was the sharing of profits like? What were the percentages? They identified a price. Like it was like $1.15 per yard. No, no, no. I'm asking what did the complaint allege about that sharing of profits? Just that I don't recall, Your Honor. It's that they were going to charge a price for what we sold. When I got the dollars in, my client got the dollars in, they received whatever they charged for their product. I do not know. That's not a sharing of profits. They didn't get paid. They're charging you. They're charging you a per-item cost. They're allocating to themselves, but they don't get a dime until I... It doesn't matter what they... They aren't... Maybe I've got this industry all wrong, but I'm thinking about it in the way that other industries operate. A sharing of profits is a number of entities or people get together in a joint endeavor. They produce a product. Everybody contributes a little bit to the product. Somebody designs it. Somebody builds it. Somebody ships it. Somebody markets it. Somebody sells it. When the product gets sold for X amount of dollars, each one of those players gets a percentage of the profits above cost. That sort of relationship is not alleged in the complaint. The relationship is my client provided the sales services. They provide the manufacturing, warehousing, and cutting services, and the money was given once a sale was made. They recouped what they allocated. And how much did you sell for? How much did your client sell for? At the time, I don't know off the top of my head, Your Honor. Does the complaint allege how much your client sold for above cost? Probably does not, Your Honor. Isn't that a concern or a problem for you? Not for pleading at the stage. Not at the pleading stage. No. I allege the facts. How do we know it's not a manufacturer distributorship arrangement? Well, at the stage of pleading, I've pled a partnership. If they want to defend it, if they want to argue defenses, then fair enough. But have I plausibly pled one? I believe I have. You affirmatively pled that no costs were incurred by StarPro until a sale was made, right? So there was no kind of risk sharing amongst the parties. You didn't have a risk. If you didn't sell it, you didn't pay them, right? I have my marketing risks. I have my... Right, but how was the risk shared? Well, they had the manufacturing risk. I had the marketing risk. I mean, I had my expenses on my marketing side because that's what I contributed to the arrangement. They had the risks on the manufacturing side because that's what they contributed to the arrangement. But they're not building this product until you tell them you've got a customer, right? No, sir. They have it in inventory. How many are they making? They make like a roll at a time. What does that mean in the industry? You have to talk to people who don't know about putting surfaces. Your attorney... I'm an attorney while you're on. I haven't been up there. I mean, a roll, it's a manufacturing plant. It's like making carpet. It comes off on a roll. No, no, but the roll is not enough. You have to assemble the putting surface. You have to cut it. You have to cut it. And you have to put it on top of rubber. That's the whole process. And you've got to put it on a base. How many of those things do they have sitting up there on a given day? Usually it's one roll at a time. And a roll is, I don't know. I honestly don't know. It could be 300 feet by 15. A roll is 15 feet wide. It could be 300 long. But they're not cutting the roll and building the putting surface until you have a customer, right? That is correct. It's an inventory. That's what I'm saying. They have the cutting phase. They still contribute after I make sales. They still contribute to the process. Okay. Right. Sorry about that. That took a while. That's okay. That's okay. I'll give you two more minutes so you can make your argument and wrap up. Okay, so we still have a breach of contract. Fair enough. We won't get there. On the antitrust side, I'm going to jump around a little bit, hit some things. The market power question you have. What is the market power? I'm just going to read what I had ahead of time. Market power is pledged through the defendant's sole source control of the product. They have the sole source for my access. The absence of interchangeable substitutes. Here's the thing about the MPT, okay? It provides a singular stimp value in a long area. No other putting surface does that. We're talking a 20 by 20 area. You can go from there, 10 foot putt, 7 foot putt. A normal carpet in one direction gives you a 7. In another direction, it will give you a 12. Inconsistent. My product is the only one of which they helped manufacture for me. That's why it's not easy to make. It still took them nine months to make even after they knew the secret formula. And there's different manufacturing processes. It provides a unique experience. That's why they approached me, Your Honor. They came to me. No one is denying that based on the allegations of the complaint, this product offered something different. But there's a concept called product elasticity and antitrust law. So for example, despite the benefits that your putting surface provided to aspiring golfers, if your product cost, I'm making this up, okay? Just for purposes of making the point. If your product cost 50 times what a comparable less efficient product might cost, a number of consumers might choose the lower priced alternative because they're not willing to pay 50 times more to be a little better on a golf course in terms of their putting. And so product elasticity matters every once in a while in antitrust law because if customers are willing to shift to other alternatives that are differently priced, then that affects what the product is and what the product market is. I agree, Your Honor. I'm just articulating that candidly. We haven't gone there. But on the brown shoe, I define a sub-market and the pleading and the complaints define a sub-market. It's a sub-market that's recognized by defendant. That's why they came to me. It's a distinct product with a unique cross-stitch construction that makes it unique. That's a brown shoe factor. There is no reasonable substitute on a same stint value on a 20-foot thing. You can have crappy turf. They sold crappy turf. That's why they come to me. There isn't a reasonable substitute for that function. That function to have a singular stint value in a large area.  Cross-stitch city, duh-duh. Guy, yeah, guy can pay for cheap stuff for a 20 by 20. He's not learning anything. I don't have a substitute. I have a defined customer base. Again, that's why they came to me. They need me to do it. And I am alleging, as of today, the facts show they are the sole source manufacturer. You can substitute inferences, anything. They are the sole source. Given all that, I believe on a brown shoe, I have adequately defined a sub-market. How many customers are there in this market, Mr. Boss? As pled in the complaint? None pled in the complaint, Your Honor. If you have one customer for this, I'll make an extreme hypothetical. If your client has one client over the years who just because he wants a new product buys a new one of these every year, is there a monopoly claim? A refusal to deal claim? Again, it's refusal to deal. Yeah, I believe. Is there a refusal to deal? If the consumer has suffered a price increase. If you have only one client in all, if your client has only one customer in all of these years, is there a refusal to deal in violation of the federal antitrust laws? I will say I do not know that answer, Your Honor. If I had to speculate, I'd say probably not. You were correct. But yes, the complaint did not allege it. There's a lot of things, apparently not, but did I allege a plausible basis? I did. The district court did not challenge the product market. Today we're talking about the geographic market and I'm alleging it's what it actually was. It's what we sold. Did I allege that they sell stuff international? Yeah, they're an $8 billion company. Not MPT. They make synthetic turf everywhere. Everywhere. This isn't a synthetic turf thing. This is an MPT putting. So I believe the dismissals should be overturned. I have pled plausible. The geographic market is plausible. The product market wasn't challenged. The market power is plausible. Let the facts determine. Get me into the door. Thank you. All right. Thank you both very much. All right. Take your time setting up. I'll call the last case. Number two.